997 So.2d 621 (2008)
STATE of Louisiana
v.
Dayshawn NOIL.
No. 08-KA-278.
Court of Appeal of Louisiana, Fifth Circuit.
October 28, 2008.
*622 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Desirée M. Valenti, Shannon Swaim, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Bruce G. Whittaker, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY, and MADELINE JASMINE.
MADELINE JASMINE, Judge Pro Tempore.
The defendant was convicted of aggravated flight from an officer, aggravated assault of a peace officer with a firearm, and illegal possession of a stolen thing valued at $500.00 or more. He has appealed his conviction of aggravated assault of a peace officer with a firearm. For the reasons that follow, we affirm.

FACTS
At trial, Deputy Greg Joerger, of the Jefferson Parish Sheriff's Office, testified that on December 17, 2007, while patrolling his assigned area, he noticed a white Mazda CX7 or CR7 entering "Mary Poppins," also known as the "Tallow Tree" area. Deputy Joerger followed the vehicle to perform a traffic stop because the driver was speeding. Deputy Joerger ran the vehicle's Mississippi license plate, which *623 came back registered to a 1989 Pontiac.[1] Deputy Joerger called for backup, and continued to follow the vehicle while never losing sight of the occupants. When the vehicle eventually stopped, Deputy Joerger exited his vehicle. His backup, Deputy Lentz, arrived at the same time. When the passenger in the vehicle got out, Deputy Joerger told him to approach. However, the passenger ran towards an apartment complex. Then the driver, later identified as defendant, sped away. Deputy Joerger followed the defendant while Deputy Lentz followed the passenger. When the defendant attempted to make a right turn, he lost control of the vehicle. The defendant ran into a parked vehicle, pushing it into a house, and then he hit a tree in a neighboring front yard. The defendant exited the vehicle and ran away. Deputy Joerger pursued the defendant on foot. The defendant jumped a fence by the canal running back to "Mary Poppins" or "Tallow Tree," which is located on the other side of the canal. Deputy Joerger ordered the defendant to stop. Deputy Joerger testified that after the defendant climbed over the fence, he saw the defendant raise his hand holding "what appeared to be a black gun" and "two shots were fired." Deputy Joerger testified that he immediately dove to the ground, losing sight of the defendant for the first time. Deputy Joerger broadcast a description of the defendant on the radio stating defendant was wearing gray or grayish pants, a white t-shirt, and white tennis shoes. The tape of correspondence between Deputy Joerger and the Sheriffs Office dispatcher giving the details of the attempted traffic stop and pursuit, as well as a computer printout transcribing the tape, was admitted into evidence. The printout indicates the incident started at 3:42 p.m. The tape was played for the jury. Gunshots can be heard on the tape.
Lieutenant Bruce Harrison, Commander of the Jefferson Parish Sheriff's Office Robbery Section, testified that the defendant became a suspect in this incident based on the statement of co-defendant Jamar Douglas[2]. Sergeant Larry Dyess, who also works with the Jefferson Parish Sheriffs Office Robbery Section, testified that he participated in the investigation of the defendant, whom he identified in court. According to Sergeant Dyess, he and the other officers went to the defendant's residence in an attempt to locate him and to inquire whether he would voluntarily come in to be questioned. Lieutenant Harrison and Sergeant Dyess both testified that the defendant was standing outside when they arrived. Lieutenant Harrison informed the defendant that he was under investigation for having fired at a police officer and advised him of his rights. Sergeant Dyess testified that defendant stated that he *624 watched approximately half of the Saints and Redskins game on the day of the incident.
Both officers testified that they participated in the search of the residence located at 97 Pinewood, where they believed defendant lived. They recovered a white t-shirt, a grey pair of pants, and a pair of white tennis shoes that were placed just outside of the residence. Both officers explained that the shoes appeared to have just been washed although there were traces of mud on the mesh portion of the shoes. These items, as well as pictures of these items, were introduced into evidence.
Sergeant Dyess explained that the defendant subsequently was transported to the Investigations Bureau where he was again advised of his rights, which he waived. Sergeant Dyess testified that defendant initially claimed that he did not know anything about the stolen vehicle that was used in the incident. Later, the defendant remembered the vehicle, but he still denied being inside of it. Sergeant Dyess testified that when he asked defendant, "what would you say if I told you that I recovered fingerprints from the vehicle," the defendant admitted to being in the vehicle.[3] Sergeant Dyess testified that defendant told him he got in the vehicle and touched the dashboard and radio when a friend drove the vehicle to his house and requested some musical compact discs (CDs). Defendant's recorded statement, as well as a transcription of the statement, was introduced into evidence.
The defendant testified that he told the officers that, on December 17, 2006, he was inside all day watching the Saints and Redskins game and a movie except, at approximately 3:45 p.m., when he walked outside to the sidewalk to talk to his friend, Terrance Tyler. The defendant denied any knowledge of the shooting. The defendant admitted that he knew co-defendant, Joshua Green, also known as Jamar Douglas. The defendant testified that the last time he saw Green was on Tuesday, a week before he was arrested, driving the aforementioned Mazda in the Fisher Project. Green got out of the vehicle and talked to the defendant and some other people. The defendant claimed that he also gave Green some CDs. The defendant testified that Green asked if he wanted to go for a ride in the car and told him the Mazda was a rental. The defendant claimed he left and went back inside because he knew Green did not have any money for a rental.
In addition, the defendant testified that he told Sergeant Dyess that when Green came to his home on the day of the incident, they talked through the window of the Mazda. He did not sit in the vehicle. However, the defendant told Sergeant Dyess that the police probably had his prints because he touched the outside of the driver's window and CDs. Defendant also admitted that he "stuck [his] head in [through] the window" of the Mazda and reached his arm in to look at the vehicle. The defendant testified that he did not steal the Mazda. The defendant testified that he had never been in the Tallow Tree or Mary Poppins area. Defendant denied living at the residence the police searched. While he admitted that the pants obtained during the search were his, he testified that the white shirt did not belong to him. He admitted that the shoes were his and had been washed, explaining that because they were white, they "get dirty fast."
Kendra Wilson, the defendant's girlfriend, testified that she and the defendant lived in her mother's house located at 97 *625 Pinewood. Wilson testified that, on the Sunday before the defendant was arrested, she and the defendant watched a Saints game and a movie. According to Wilson, on the day of the incident, the defendant only left to smoke a cigarette. Wilson testified that the defendant did not own any guns, and she never saw him with any weapons, including a black gun.
Terrence Tyler testified that, on Sunday, December 17, 2006 at approximately 12:30 p.m., he went to the defendant's house to watch the Saints game. At approximately 1:00 p.m., he and the defendant went outside. Tyler testified that while they were outside, Jamar Douglas[4] drove up in a Mazda Jeep that looked like a rental. Douglas asked them if they wanted to go for a ride. After the defendant declined, Tyler and the defendant went back into the house. Tyler testified that he stayed at the residence after the Saints game watching television then he left the residence at approximately 5:00 p.m. Tyler claimed that he heard that Douglas returned to the defendant's house in the same vehicle on Monday or Tuesday to get some CDs.
In rebuttal, the State presented testimony from the television station broadcasting the Saints game the day of the incident. This witness testified that the December 17, 2006 Saints game ended at 3:10 p.m.
At the conclusion of trial, the defendant was found guilty of count one aggravated flight from an officer, a violation of LSA-R.S. 14:108.1(C)[5], count three aggravated assault of a peace officer with a firearm, a violation of LSA-R.S. 14:37.2, and count four illegal possession of a stolen thing valued at $500.00 or more, in violation of LSA-R.S. 14:69.[6] Subsequently, the trial court sentenced the defendant to two years on count one, ten years on count three, and ten years on count four, all to be served consecutively and at hard labor. In addition, the trial court imposed a fine of $5,000.00 on count three.
On May 7, 2007, the State filed a Bill of Information alleging the defendant to be a second felony offender, seeking to enhance the penalty for the conviction of aggravated assault. Subsequently, the defendant admitted to the allegations in the multiple bill.[7] Thereafter, the trial court vacated the defendant's previous sentence on count three and sentenced him as a second felony offender to 14 years at hard labor to run consecutive to the other sentences previously imposed. The defendant filed a timely Motion for Appeal.

ASSIGNMENT OF ERROR NUMBER ONE
The defendant appeals only his conviction for aggravated assault upon a peace officer with a firearm. The defendant argues that the evidence was insufficient to prove that he committed the offense because the State did not prove that he assaulted the police officer with a firearm, that is, "an instrumentality used to propel shot, shells or bullets by the action of gunpowder." Specifically, the defendant claims that the State failed to prove the propulsion of shot, shell or bullet by some physical manifestation such as a *626 spent casing, a bullet fragment, a strike mark, or the appearance of smoke or flash from the barrel of the instrumentality. In addition, for the first time on appeal, the defendant claims that the State failed to disprove the reasonable hypothesis that he carried an instrumentality such as a starter, cap, toy, or pellet gun that only appeared to be a black gun.[8]
The State argues that it proved that the defendant committed the offense of aggravated assault upon a peace officer with a firearm through the testimony of Deputies Joerger and Lentz. According to the State, Deputy Joerger testified that he observed the defendant "raise his hand and fire two shots from a black gun." In addition, Deputy Joerger testified that he ducked for cover because he was afraid he would be shot. Deputy Lentz also testified that he heard three shots fired and ducked for cover in response. The State claims that Deputy Joerger's years of experience as a police officer gave him the ability to distinguish between the look and sound of a firearm and that of a BB or air gun. The State contends that the jury found the testimony of the deputies to be credible, which allowed them to find the defendant guilty of the offense beyond a reasonable doubt.
The constitutional standard of review for determining the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). (Emphasis in original).
LSA-R.S. 14:37.2(A) and (B) state:
A. Aggravated assault upon a peace officer with a firearm is an assault committed upon a peace officer who is acting in the course and scope of his duties with a firearm.
B. For purposes of this Section, "firearm" is defined as an instrument used in the propulsion of shot, shell, or bullets by the action of gunpowder exploded within it.
LSA-R.S. 14:36 defines assault as "an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery." Therefore, in order to convict a defendant of aggravated assault upon a peace officer with a firearm, the State must prove that the defendant (1) with a firearm, (2) attempted to commit a battery or intentionally placed a peace officer in reasonable apprehension of receiving a battery, (3) while the peace officer was acting in the course and scope of his duties.
In the present case, the defendant claims that the State failed to prove the propulsion of shot, shell, or bullet by some physical manifestation such as a spent casing, a bullet fragment, a strike mark, or the appearance of smoke or flash from the barrel of the instrumentality. However, contrary to the defendant's assertion, the physical manifestation of the propulsion of shot, shell, or bullets from the firearm is not an element of the offense. The State *627 was only required to prove aggravated assault with a firearm, not a physical manifestation showing that a gun was fired.
The State cites State v. Payne, 00-2129 (La.App. 4 Cir. 7/25/01), 794 So.2d 79, writ denied, 01-3342 (La.11/1/02), 828 So.2d 570, in its brief. In Payne, the court affirmed the defendant's aggravated assault convictions. The appellate court noted that two police officers testified that the defendant pulled a gun and attempted to fire upon them. One of the officers testified that he was pursuing the defendant in his police vehicle when the defendant stopped, turned around, pulled out a gun from his waistband, and aimed at him. This officer ducked for protection, which caused him to crash into a church. Then, the defendant pointed the weapon at another officer. The other officer testified that he was scared when the defendant aimed the weapon at him. The appellate court found that officers' testimonies were sufficient to prove that the defendant committed aggravated assaults upon the police officers as required by LSA-R.S. 14:37.2. Payne, 00-2129 at p. 6, 794 So.2d at 83.
In the present case, similar to the facts in Payne, Deputy Joerger testified that he saw the defendant raise his hand holding what appeared to be a black gun before the defendant fired two shots at him. Deputy Joerger immediately dove to the ground. Deputy Lentz testified that he heard gunshots, and then ducked for cover in response. Deputies Lentz, as well as Deputy Joerger, called in that gunshots had been fired. In addition, the 911 supervisor testified that he could hear gunshots and people shooting at the officers on the 911 tape. The 911 tape was also played for the jury.
The Jackson v. Virginia standard does not serve as a vehicle for an appellate court to second guess the rational credibility determinations of the fact finder at trial. State v. Vincent, 07-239, p. 8 (La.App. 5 Cir. 12/27/07), 978 So.2d 967, 973. Viewing the evidence in a light most favorable to the prosecution, the jury could have rationally chosen to believe the evidence presented by the State and concluded that the State proved the defendant committed an aggravated assault upon a peace officer with a firearm beyond a reasonable doubt based on the testimony of the police officers who were at the scene, the testimony of the 911 supervisor, as well as the 911 tape.

ERROR PATENT DISCUSSION
The defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990) regardless of whether defendant makes such a request. The review reveals an error patent in this case.
We note that the commitment does not accurately reflect the defendant's conviction on count four. The commitment states, "The Defendant was found GUILTY by a Jury on count 4) 14:69 F III RECEIVING STOLEN THINGS $300+." However, the defendant was charged in count four of the Bill of Information with intentionally possessing, procuring, receiving, or concealing a 2007 Mazda CX-7 valued at "$500 and more." Also, during trial, the State and defense stipulated that "the car was new and worth $27,315.00." In addition, the verdict sheet, as well as the transcript, indicates that the jury found the defendant guilty of possession of stolen things valued at $500.00 or more. The trial judge also sentenced the defendant for his conviction on count four of the Bill of Information to ten years, which is within the statutory sentencing guidelines for a conviction for possession of stolen things with a value of $500.00 or *628 more. See LSA-R.S. 14:69(B)(1). Therefore, the notation in the commitment/minute entry is in error.
In State v. Parnell, 07-37, p. 15 (La.App. 5 Cir. 5/15/07), 960 So.2d 1091, 1100, writ denied, 07-1417 (La.1/7/08), 973 So.2d 733, this Court noted that clerical errors in the commitment should be amended even though they do not cause prejudice to a defendant's rights meriting reversal. Accordingly, this matter is remanded to the trial court to correct the error in this commitment.

CONCLUSION
For the foregoing reasons, the defendant's conviction is affirmed. This matter is remanded for the trial court to amend the commitments as ordered.
AFFIRMED; MATTER REMANDED.
NOTES
[1] During trial the State and defendant entered the following stipulation:

"The State and the Defense hereby enter into a stipulation that [if] Scott Nevar, (phonetic)[,] the car manager at Bill Hood Mazda in Hammond Louisiana testified, he would state that on November 28, 2006, a 2007 Mazda CX7, Vin. No. JM3ER293870142182 was stolen from the dealership. He would testify that the keys to the vehicle were stolen as well. He would further testify that the car was new and worth $27,315.00 [sic] the State and the Defense enter into a stipulation that the car that Deputy Greg Joerger chased[,] in which [the defendant] eventually crashed into the tree at 1846 Claire Avenue was one [and] the same 2007 Mazda, CX7 as stolen from Bill Hood Mazda on November 28, 2006."
[2] According to Lieutenant Bruce Harrison, co-defendant, Joshua Green, is also known as Jamar Douglas. While the record never specifically states that co-defendant, Green, was a passenger in the vehicle, it appears from the testimony of Detective Joerger and Detective Lentz that Green was an occupant of the vehicle.
[3] According to the State's witnesses, Kim Stierwald and Lieutenant Luis Munguia, a fingerprint from the outside of the vehicle matched the defendant's fingerprint.
[4] As noted previously, co-defendant, Green, is also known as Jamar Douglas.
[5] Count two of the indictment was dismissed prior to trial.
[6] Co-defendant, Joshua Green, was also charged in count four. Green is not part of this case on appeal.
[7] In addition, the defendant stipulated that he was on parole during the ten-year cleansing period between his current conviction and the underlying felony conviction.
[8] The defendant did not argue, in the trial court, that he could have carried a starter, cap, toy, or pellet gun in his hand. A defendant cannot split alternative and inconsistent defenses in different forums by raising one defense before the jury and when it fails raising a second defense presupposing a different set of facts in an appellate court conducting sufficiency review under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and LSA-C.Cr.P. art. 821(E). State v. Juluke, 98-0341, pp. 4-5 (La. 1/8/99), 725 So.2d 1291, 1293. Therefore, the defendant is prohibited from raising this defense, on appeal, which presupposes a different set of facts than those raised in the trial court. However, we have decided to address the merits of defendant's argument.